76 So.2d 436 (1954)
Rody MYERS, Plaintiff and Appellant.
v.
JAHNCKE SERVICE, Inc. and The Employers' Liability Assurance Corporation, Limited, Defendants and Appellees.
No. 20479.
Court of Appeal of Louisiana, Orleans.
November 8, 1954.
Rehearing Denied January 3, 1955.
Writ of Certiorari Denied February 14, 1955.
*437 Dodd, Hirsch & Barker, and Thomas J. Meunier, New Orleans, for plaintiff and appellant.
Deutsch, Kerrigan & Stiles, and Marian Mayer, New Orleans, for defendants and appellees.
McBRIDE, Judge.
Plaintiff, Rody Myers, had been employed as a shipfitter by Jahncke Service, Inc., at its yard in Madisonville, Louisiana, since April 1949, and on October 4, 1950, during the course and scope of his employment he met with an accident wherein his right hand was so badly mangled that the physicians amputated the member two inches above the wrist. After the accident plaintiff did no work whatever until October 14, 1951, when he was re-employed by Jahncke Service, Inc., in the capacity of "pusher" (which we conceive to be a sort of subforeman) at the Madisonville Yard. Plaintiff was carried on the payroll at an hourly rate of pay approximating that which he earned prior to the accident and his earnings each week amounted to more than $30 during the period he worked as a pusher, with the exception of one week when he made but $9.60. Except for the period commencing August 12, 1952, and terminating January 11, 1953, during which he was absent on leave without pay, Myers continued on as a pusher until January 22, 1954, when of his own volition he left *438 defendant's employ and has remained unemployed ever since.
The compensation insurance carrier for Jahncke Service, Inc., paid Myers compensation at the rate of $30 per week from the date of the accident, October 4, 1950, up until August 18, 1953, or for a period of 150 weeks. When Myers quit his job as pusher on January 22, 1954, the compensation insurer resumed making the weekly compensation payments and continued making such payments to June 4, 1954; thus, the aggregate number of weeks for which compensation was paid to plaintiff is 169. The total number of weeks which plaintiff worked as pusher and earned more than $30 each week is 76. So here we have the novel situation where an injured workman has received both compensation and wages from his employer at one and the same time over a considerable period.
Chronologically, the pertinent periods since plaintiff's accident can be tabulated as follows:
1. From October 4, 1950, to October 14, 1951 (53 weeks) plaintiff received $30 a week compensation from the appellees herein.
2. From October 14, 1951, through August 17, 1952 (a period of 44 weeks) appellant continued to receive $30 a week compensation and in addition approximately $50 to $60 a week as wages.
3. From August 17, 1952, to January 12, 1953 (21 weeks) appellant took voluntary leave from work to be with his wife who was sick. He continued to receive $30 a week in this interval but no wages.
4. From January 12, 1953, to August 17, 1953 (a period of 32 weeks) appellant again received both compensation of $30 and a wage of $50 to $60.
5. After August 17, 1953 the compensation payments ceased and from August 17, 1953 through January 22, 1954 (a period of 23 weeks) appellant received only his wage.
6. On January 22, 1954, he resigned his job and from that date up to June 4, 1954, (19 weeks) he received $30 a week in compensation.
Myers instituted this suit against Jahncke Service, Inc., and the compensation insurer on September 10, 1953, alleging that the loss of the hand in the accident of October 4, 1950, rendered him totally and permanently disabled from performing work of any reasonable character. He prayed for a judgment against both defendants for workmen's compensation at the rate of $30 per week for a period of 400 weeks less whatever compensation may have been paid to him.
The chief defense is that in addition to a credit for the weekly compensation paid, defendants are entitled to an additional credit of $30 each week since plaintiff's accident during which he worked for Jahncke Service, Inc., and received a weekly wage of more than $30, this on the theory that the wages paid Myers were not earned, but, on the contrary, were in the nature of gratuities. Alternatively, defendants contend that the credit is due even if it be held that the wages were actually earned by Myers. In other words, defendants' argument is that whether the wages were earned or unearned, the fact remains Myers worked for the same employer and he cannot receive both salary and compensation at the same time.
The case was duly tried and culminated in a judgment in plaintiff's favor and against both defendants in solido for workmen's compensation at the rate of $30 per week for 400 weeks. The trial judge concluded that the wages paid Myers were actually earned by him but that defendants were nevertheless entitled to the credit they sought. The judgment, with respect to the credits, provides:
"It is further ordered, adjudged and decreed that defendants herein be declared currently paid up in all compensation *439 payments that may have been due Rody Myers through June 4, 1954, and that in addition it be further recognized that defendants have paid Rody Myers, in advance, eighty-seven (87) weeks of compensation benefits which are not yet due; and
"It is further ordered, adjudged and decreed that credit for the advanced payment of 87 weeks compensation already paid by the defendants to the plaintiff be given, in accordance with [LSA] R.S. 23:1206, by shortening the period during which compensation shall be paid."
Plaintiff has perfected this appeal from the judgment; defendants have answered alleging that the judgment is correct and praying that it be affirmed. Alternatively, defendants pray the judgment be amended (1) to decree that the wages paid Myers for his services as pusher were in reality gratuitous and were not paid for the performance of any actual work, and that the payment of such wages, or gratuities, is equivalent to the payment of compensation, or (2) that it be decreed that the wages were earned and that Myers no longer can be said to labor under a disability and he is entitled to no further compensation.
At the outset let it be said that we are of the opinion that whatever wages plaintiff received from Jahncke Service, Inc., during the two periods he worked after the accident were not and cannot be considered mere gratuities or benevolences, as the record convinces us that Myers performed all of the duties required of a pusher and that the wages were paid on a quid pro quo basis. It is perfectly true that Jahncke Service Inc., created the job for Myers to assist in his rehabilitation, but the record leaves no room for doubt that the duties required of Myers cannot be characterized as "light work" in the sense that the term was ordinarily used in similar cases where courts have been confronted with the defense raised here. Jahncke Service, Inc., first offered to re-employ Myers as a night watchman, but Myers refused the offer. He was later offered and accepted the job of pusher. The foreman at the Madisonville Yard testified that in the morning he would send out the several groups of men to the various places at which they were to perform their labor and that one gang would be placed under the charge of Myers who would go out with the men. The foreman, on his direct examination, when interrogated as to what were Myers' duties, answered:
"He was supposed to see that those men worked. * * * He was supposed to see that this work and the job was carried out. * * * I took Mr. Rody Myers out there and showed him what I wanted on the job and he was supposed to carry it out like I told him to."
The manager of the Marine Department of Jahncke Service, Inc., testified: "Well, he (Myers) moved in the group. * * * He was with them showing them what to do." Myers testified that in addition to the duties mentioned above, he was required to check and keep a record of all materials used on the job and to make report to the Supply Room.
This is not a case where an injured workman is re-employed and assigned only the lighter portion of the duties of his previous occupation, but we are dealing with a workman who is incapacitated from carrying on his former job and who has been re-employed to perform the duties of another and entirely different occupation. Myers, although in a crippled condition, was able to carry out and undoubtedly did carry out to the satisfaction of Jahncke Service, Inc., all duties required of him as a pusher, chiefly in supervising the men placed under his charge and in instructing them as to how they should perform their work, and in pointing out to them what work they should do. It must not be overlooked that Myers was experienced and qualified as a shipfitter as he had not only worked for Jahncke Service, Inc., for some time in that capacity but had also worked for others, and his knowledge *440 of the trade undoubtedly equipped him to render substantial and valuable services to Jahncke Service, Inc.
It is said that before Myers was reemployed, Jahncke Service, Inc., had never had a pusher on its payroll and had never found such services as were rendered by Myers to have been necessary in its business. Testimony emanating from the defense witnesses is to the effect that when Myers took the leave of absence without pay between August 1952 and January 1953 no one was employed to take his place and there was no other pusher in the Madisonville Yard. The argument is made to us that the job of pusher was nonessential and it is contended that the wages paid Myers for his services as pusher amounted to mere gratuities. This is not so. Myers performed all of the duties required of him in the new and different occupation of pusher, which entailed activities of an entirely different nature and class from those of his former occupation, in which he was called upon to use hand tools, fit various types of plates so the welders could weld them, handle heavy material, and to do carpentry work.
It is conceded that Myers, because of the amputation of his right hand, will be forever incompetent and physically unfit to perform the duties which must be performed by a shipfitter or any other similar manual duties, and therefore he must be classified as totally and permanently disabled within the sense of the statute. The well-established jurisprudence of this State is to the effect that where an employee loses a member of his body by amputation and such loss produces incapacity to do his work, the workman is to be regarded as totally and permanently disabled, and the injury is to be controlled by the disability portions of the workmen's compensation statute. Washington v. Independent Ice & Cold Storage Co., 211 La. 690, 30 So.2d 758, and the many authorities therein cited. The duties which the employer required of Myers in the capacity of pusher were vastly different and did not require the manual efforts previously required by him as shipfitter, and the fact that Myers was able to work at such different occupation does not take him out of the category of a workman who is totally and permanently disabled within the meaning and intent of the statute.
The term "disability to do work of any reasonable character", LSA-R.S. 23:1221, as contained in the compensation statute, means disability to perform work of the same or similar description, kind, or character to that which the claimant was accustomed to perform or was undertaking when the injury occurred. Scott v. Hillyer, Deutsch, Edwards, Inc., 217 La. 596, 46 So.2d 914; Morgan v. American Bitumuls Co., 217 La. 968, 47 So.2d 739; Falgoust v. Maryland Casualty Co., La. App., 22 So.2d 312; Loflin v. Erectors & Riggers, Inc., La.App., 68 So.2d 694. In Ranatza v. Higgins Industries, Inc., 208 La. 198, 23 So.2d 45, it was pointed out that the disability to perform work of a similar character as that engaged in by the workman at the time of his accident is considered total disability within the meaning of the compensation law, notwithstanding the injured employee may have succeeded in obtaining employment after the accident of a different kind. The Court of Appeal for the First Circuit in McKenzie v. Standard Motor Car Co., 15 So.2d 115, held that where an injury sustained by an automobile repair shop employee totally disabled him from doing manual work, the fact that he later obtained a position as superintendent in another shop did not deprive him of his right to compensation as he could no longer return to the occupation for which he was fitted by training and experience and which he was engaged in when injured. In Cobb v. A. G. McKee & Co., La.App., 45 So.2d 432, it was held that where a structural steel worker suffered a back injury permanently precluding him from doing heavy work required in that kind of occupation and he subsequently performed the services of "flagger" with the same employer, he was nevertheless to be considered totally and permanently disabled within the meaning *441 of the workmen's compensation law, notwithstanding that the pay received as flagger exceeded the pay earned before the injury occurred.
In his assignment of errors, the appellant makes the complaint that the trial judge should not have allowed defendants a credit of one week's compensation for each of the weeks that appellant worked after the accident. Appellant takes the position that such wages were not gratuities or benevolences but were actually earned and that earned wages cannot form the basis of the credits defendants contend for.
The identical issue raised by this appeal was presented to this court in the case of Daigle v. Higgins Industries, Inc., 28 So.2d 381 and 29 So.2d 374, which involved a workman who had sustained injuries which rendered him permanently disabled from doing work of any reasonable character. About two months afterward the plaintiff returned to work with the same employer and was assigned light duties for a few weeks but was paid substantial wages approximating those which he had previously earned, and which wages each week amounted to several times the compensation he would have collected had he not returned to work. After doing the light work for a few weeks, the plaintiff returned to duties somewhat similar to those in which he was engaged at the time of the accident, and he continued to work and earn his wages for some months. During that period also the wages paid him approximated those which he had previously earned and amounted each week to several times the amount of the compensation which would have been paid him. We found it as a fact that during said period plaintiff performed valuable services and actually earned the wages paid him. The plaintiff was later discharged and then brought the suit for compensation praying for the maximum amount for the period of 400 weeks. The defendant employer and its insurance carrier contended that plaintiff was not entitled to receive compensation for the 35 weeks after the accident during which he worked for the same employer and earned and received wages about equal in amount to the wages which he earned prior to the accident. In our original opinion, 28 So.2d 381, we held that where the injured employee, although he be totally and permanently disabled from doing work of any reasonable character, can nevertheless return to work and earn his wages, that credit for those weeks should not be given to his employer against any compensation which might ultimately be held due the worker. On rehearing, 29 So.2d 374, we reconsidered that point, and in our opinion we analyzed and discussed a host of decisions which presented issues analogous or pertinent to those which confronted us, notably, Carlino v. United States Fidelity & Guaranty Co., 196 La. 400, 199 So. 228; Holliday v. Martin Veneer Co., 206 La. 897, 20 So.2d 173; Thornton v. E. I. Du Pont De Nemours & Co., 207 La. 239, 21 So.2d 46; Brown v. Continental Oil Co., La.App., 22 So.2d 758; Vega v. Higgins Industries, Inc., La.App., 23 So.2d 661; Annen v. Standard Oil Co. of New Jersey, La.App., 28 So.2d 46; D'Antoni v. Employers' Liability Assurance Corp., Ltd., La.App., 28 So.2d 49 (which was later destined to be reviewed by the Supreme Court); Gautreau v. Maryland Casualty Co., La.App., 28 So.2d 96. Our ultimate conclusion on rehearing was:
"* * * that it was the purpose of the act to assure an injured employee, who could no longer earn his living, that he would not become a public charge nor a burden upon his family, and that at least for 400 weeks, or nearly 8 years, he should be provided for by the employer for whom he was working at the time of sustaining his injuries. It seems to us that it would be absurd to say that if an employee should be injured he should have the right to obtain a judgment for compensation for 400 weeks, and if able to earn a substantial livelihood from the same emyloyer, at the same time contend that he is disabled from doing any work of a reasonable character, meanwhile holding the compensation *442 judgment over his employer's head.
"In short, we take the view that if, during that period for which compensation is due, the injured workman can earn a substantial living by working for the same employer at wages approximating those earned before the accident, the weeks for which he should earn such wages should be deducted from the 400 weeks during which compensation might otherwise be due to him." [29 So.2d 379.]
We might mention that the case of D'Antoni v. Employers' Liability Assurance Corp., Ltd., supra, first decided by the Court of Appeal for the First Circuit, whose decision was mentioned in the Daigle case, was later reviewed by the Supreme Court, 213 La. 67, 34 So.2d 378, 381, which said:
"* * * If the employee is actually earning the wages paid him, his suit cannot be dismissed on a plea of prematurity forasmuch as he is not receiving compensation. * * * Conversely, if it is shown on the trial of the plea that the wages being paid the employee are in reality a gratuity and not for the performance of work, then the action will be dismissed as prematurefor, in such instance, the payment of the wage is the equivalent to the payment of compensation."
However, were it not for the decision of the Supreme Court in Mottet v. Libbey-Owens-Ford Glass Co., 220 La. 653, 57 So.2d 218, which is contrary to what we held in the Daigle case, we would adjudicate the issue before us on the basis of our conclusion in the Daigle case, which, incidentally, was followed by our brothers of the Second Circuit in Goodman v. Hillyer, Deutsch, Edwards, Inc., La.App., 49 So.2d 60.
The plaintiff in Mottet v. Libbey-Owens-Ford Glass Co. brought suit seeking recovery from his employer of compensation for total and permanent disability. The defendant opposed the suit by pleading peremption and denying that the disability resulted from an accident. On trial, the lower court rendered judgment sustaining the defendant's plea of peremption and ordered the suit dismissed. A rehearing was granted and the judgment was set aside, and judgment was rendered in favor of the plaintiff for the amount of compensation prayed for. Defendant appealed to the Court of Appeal for the Second Circuit, where the judgment was reversed and the plea of peremption was sustained and plaintiff's suit dismissed. See 49 So.2d 38. Plaintiff then applied to the Supreme Court and was granted a writ of review. The evidence in the case showed that the plaintiff, a glass cutter since 1913, remained at work for several months, notwithstanding that he had been injured on the job. Later, plaintiff learned of the serious nature of his injuries but continued to work for defendant but was changed at his request from cutting heavy glass to work on light glass. Eventually he was forced to leave the job and thereafter remained totally and permanently disabled. Subsequently, plaintiff was re-employed by the defendant not as a glass cutter but as night watchman, and the defendant contended that it should be given credit against any compensation award for the wages paid the plaintiff as night watchman after plaintiff had become disabled to carry on his trade of glass cutting. On review of the case the judgment of the Court of Appeal was reversed and the judgment of the district court was reinstated and affirmed. In dismissing defendant's contention regarding credit for the wages paid plaintiff as night watchman, the Court had this to say [220 La. 653, 57 So.2d 220]:
"The defendant contends that credit should be given for the wages paid the plaintiff as night watchman after he became disabled to carry on his trade of glass cutting. * * * The wages paid the plaintiff as night watchman were earned in a different kind of work, not requiring any special skill or training, and cannot be considered in the nature of compensation or given credit on the award of compensation to the plaintiff."
*443 The expression of the Supreme Court is clear and explicit and we believe it to be our duty to faithfully follow the holding in adjudicating the same issue in the instant case.
The quoted language is not obiter dictum, as counsel say it is, and the language was employed by the Court to decide an important and controverted issue in the case. We have examined the record therein and find that defendant in its brief contended vehemently that a credit should be allowed it as against any compensation it would have to pay plaintiff for the wages that had been paid plaintiff as a night watchman. The whole record was before the Court and defendant's brief squarely presented the issue of the credit. There is nothing to show that the contention made by the defendant had been made in either the trial court or the Court of Appeal, but nevertheless the defendant was free to raise such defense in the Supreme Court even in the absence of a special plea. We said in passing on a similar situation in Daigle v. Higgins Industries, Inc., supra, 29 So.2d 374, 375:
"Counsel for plaintiff contends that such plea of defendants is one of setoff and should not be entertained by us as the plea was not specially made as required by the provisions of C.P. Arts. 367 and 368. Plaintiff's counsel also cites the case of Marshall v. McCrea, 2 La.Ann. 79. We perceive no merit in such contention. In the first place, plaintiff must make out his case and can recover only such compensation as may be due him. Secondly, Sec. 18, Par. 4, of the Workmen's Compensation Act, Act No. 20 of 1914, as amended, Act No. 85 of 1926, provides in part: `The Judge shall not be bound by technical rules of evidence or by technical rules or (of) procedure other than as herein provided, * * *.'"
Upon reaching the Supreme Court the Mottet case involved not only the question of the correctness vel non of the judgment of the Court of Appeal maintaining the plea of prescription, because the granting of the writ of review had the effect of bringing before the Court not only that issue but each and every other issue involved in the case. Const.1921, Art. VII, § 11, provides in part:
"It shall be competent for the Supreme Court to require by writ of certiorari, or otherwise, any case to be certified from the Courts of Appeal to it for review, with the same power and authority in the case as if it had been carried directly by appeal to the said court * * *."
Of course the defendants must be allowed to offset the 400 weeks of compensation by whatever compensation they actually paid plaintiff. The trial judge concluded that all compensation had been paid through June 4, 1954, but our calculation shows this not to be correct. The defendants paid and plaintiff received compensation for 169 weeks, and this is the correct number of weeks which the defendants should be credited in the judgment. The judgment insofar as it allows credit to the defendants for compensation for each week that plaintiff might have worked after the accident (which the trial judge inadvertently computed to be 87 weeks) is clearly erroneous and has no legal foundation on which to rest.
For the reasons assigned, it is ordered, adjudged and decreed that the judgment insofar as it condemns the defendants, in solido, to pay plaintiff, Rody Myers, workmen's compensation at the rate of $30 per week beginning October 4, 1950, not to exceed 400 weeks, be amended so as to provide that the defendants shall have a credit for the 169 weeks of compensation heretofore paid against such award, and as thus amended the said portion of the judgment is affirmed.
The judgment in all other respects is reversed.
Defendants are to pay the costs of both courts.
Reversed in part; amended and affirmed in part.